**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANNE BRYANT,

                              Plaintiff,

     -against-

AB DROITS AUDIOVISUELS, et. al.,                    **Docket No.:07-CIV-6395**
                                                    **(SHS)**

                              Defendants.

                                                    **AFFIDAVIT IN OPPOSITION**
                                                    **TO RULE 12 (b) (6)**
                                                    **MOTION AND IN SUPPORT OF**
                                                    **RULE 11 CROSS-MOTION TO**
                                                    **STRIKE AND/OR FOR**
                                                    **SANCTIONS**

---

STATE OF NEW YORK          )
                           ss:
COUNTY OF NEW YORK         )

     PATRICK J. MONAGHAN, JR., being duly sworn deposes and
says:


     1.   I am a member of MONAGHAN, MONAGHAN, LAMB &
MARCHISIO LLP, attorneys for Plaintiff ANNE BRYANT ("Plaintiff")
and admitted to practice before the New York and New Jersey
Courts and this and other federal courts.

     2.   I and my Firm have represented Plaintiff since
2000 in connection with her claims for royalties and payments
due her. I was counsel in the related state court actions as
well.

     3.   This Affidavit is submitted into opposition to
the motions by the Sunbow and Hasbro Defendants for dismissal

pursuant to Rule 12 (b) (6) on the stated ground that the Decision of the Honorable Andrew P. O'Rourke of March 9, 2007 is res judicata as to all claims asserted in this action despite the fact that the Decision states incandescently that "…Plaintiff is entitled to whatever rights still exist under her agreements with Defendants" (Decision dated March 9, 2007).

## RULE 11 MOTION

4.    Unfortunately, the tactics employed by Sunbow's Counsel in this case are a continuum of endless motions and distractions in the related State Court litigation and the prior appeals including Sunbow's unsuccessful attempt to remove the matter to the Southern District and can only be interpreted as harassment and an effort to have a overburdened Plaintiff somehow lose faith in her claims and terminate the proceedings.

## APPEAL PENDING OF JUSTICE O'ROURKE'S DECISION

5.    Sunbow wants this United States District Court, its law clerks, its staff, and opposing counsel to wade through years of State Court pleadings and deposition testimony and a disjointed and incomplete trial in a complicated State Court litigation while knowing that the matter is on appeal. This Court is asked to predict what a New York Appellate Court would do when in fact there already is an appeal pending before the Appellate Division Second Department of Justice O'Rourke's Decision under Docket No. 07-6949 which will deal directly with

2

the import of the State Court proceedings.    Sunbow and Hasbro want to interpret Justice O'Rourke's Ruling as somehow depriving the Plaintiff of contract rights-the very rights she is asserting here-which Justice O'Rourke's Decision stated clearly were retained by her. The motions are frivolous and should be denied.    Sunbow's position here is particularly outrageous in light of its fierce and successful opposition to the allowance of contract claims [as noted by Justice O'Rourke] -claims which Sunbow now tells this Court were litigated or included.

6.    The State Court Decision dated March 9, 2007 is based on only two causes of action as set forth by the Court:

> "***The first is for unjust enrichment and the second is for constructive trust.***" During the last phase of the non-jury trial the Court had limited Plaintiff to prove that there were **oral** as well as written contracts between the parties[1]." That Sunbow's motion to dismiss the case based on Admission from the Plaintiff was made although the Plaintiff had not formally rested." "That Sunbow [objected] to Plaintiff's motion under CPLR 3025 (c) to amend the pleadings to the proof claiming that the issue in the case had been limited by Court decision and testimony to the last remaining issue of all agreements, which Plaintiff agreed under oath were not there." The Court concluded this case over Plaintiff's objections when "Sunbow moved under CPLR 4401 for a 'directed verdict'" based on Plaintiff's addition.

7.    Noting that Plaintiff had also moved for judgment against the Defendants based on certain admissions under NY CPLR 4401, the Court "dismissed" Plaintiff's motion to allow

---

[1] The Court had already found there were written agreements and specifically the Jem Agreement.

additional testimony to be on the record i.e. depositions of Jules Bacal, Ford Kinder, and Carol Weitzman because according to the Court this matter has been overtaken by events.[2]   Lastly, the Court found "the Plaintiff is not entitled to any <u>equitable</u> accounting having failed to prove a *prima facie* case against either Defendant" (Decision, Page 8).   Again, following that ruling, the Court said: "However Plaintiff is entitled to whatever rights still exist under her agreement**s** with Defendants."[3]

> **8.**   Accordingly, for Sunbow's and Hasbro's lawyers to urge a distorted and unauthorized sweeping extension of this Decision to bar all claims and contend the state court case was dismissed on anything other than procedural grounds related to causes of action for an equitable accounting and constructive trust is simply false.   This Court's time and this overburdened Plaintiff's Counsel should not have had to deal with it but it is characteristic of the "scorched earth--bury the adversary with motions papers" style characteristic of the defense of this case.

---

[2] The events are not specified here.

## SUMMARY OF COMPLAINT

9.   The Complaint's allegations are to be accepted as true purposes of Defendant's 12(b)(6) motion.

10.   The Complaint contains five (5) general causes of action against Defendants:

(a)   Breach Of Contract against Sunbow Productions, Sunbow Entertainment, Starwild Music and Wildstar Music (see Complaint at ¶79-87);

(b)   Breach of License and/or Distribution Agreements against all Defendants(see Complaint at ¶49-93);

(c)   Judicial Accounting against all Defendants(see Complaint at ¶94-105);

(d)   Breaches of Fiduciary Duty against all Defendants (see Complaint at ¶106-110);

(e)   Unjust Enrichment against all Defendants (see Complaint at ¶111-115).

11.   Generally stated, the Complaint alleges that Plaintiff Anne Bryant is the composer of several musical compositions, listed in the Complaint (see ¶2) who commenced this action against Defendants to recover music publishing and performance royalties and other contractual obligations owed to Plaintiff and as third-party beneficiary to the various agreement described in the Complaint. *See* Complaint at ¶1.

12.   Plaintiff, while working for Griffin Bacal, Inc., a New York advertising agency owned and operated by Jules M. "Joe" Bacal, composed the subject compositions as themes and

songs for broadcast use in Defendant SUNBOW PRODUCTIONS, INC.'s television show properties and for advertising purposes related to similarly named toy products (e.g. Transformers). *See* Complaint at ¶7.

13. Under the terms of an agreement ("the JEM Agreement" annexed to the Complaint as Exhibit "A"), Plaintiff transferred all her intellectual property rights to Defendant SUNBOW in consideration of among other things, the retention of Plaintiff's rights to receive all writer royalties including public performance royalties and a 50% share of music publishing royalties and to receive appropriate credits for compositions including but not limited to movie and television screen credits. *See* Complaint at ¶1.

14. Furthermore, the JEM Agreement allowed SUNBOW to exploit Plaintiff's compositions for the mutual benefit of the parties, consistent with the terms of the JEM Agreement, thus granting Plaintiff third party beneficiary rights under every subsequent license and/or agreement made by Sunbow involving Plaintiff's compositions. *See* Complaint at ¶85.

15. Specifically, Plaintiff alleges that she is entitled to music publishing royalties including but not limited to mechanical royalties and sync fees relating to Plaintiff's world-wide known and utilized compositions from the uses of her

music in various media including videos and DVDs. *See* Complaint at ¶7.

16.  Each of Plaintiff's claims are derived from her agreement as composer with Jules M. Bacal and his companies, GBI and Sunbow which are all subject to the same relationship that Plaintiff shared with Bacal.

17.  When Plaintiff conveyed the copyrights to Bacal's companies, the conveyance was made pursuant to Sunbow's express and implied representations and was based on the mutual trust and confidences conveyed to it by Bacal on behalf of Sunbow and GBI. *See* Complaint at ¶14. Bacal and his companies received Plaintiff's copyrights and musical compositions and exclusive control of the intellectual property. This understanding is set forth by the mutual terms of the Agreement to provide publishing royalties – 50% to Plaintiff and 50% to Defendants. *See* Complaint at ¶15; *see also* Paragraph 6 of JEM Agreement annexed to the Complaint as Exhibit "A."

18.  In 2000, after Plaintiff obtained her writer's catalog from BMI, she noticed as a result of Bacal's and Sunbow's wrongful actions, she had not received all of the royalties to which she was entitled and commenced and action against BMI and Sunbow in NY Supreme Court. *See* Complaint at ¶17.

19.   The Supreme Court held the Plaintiff offered sum evidence supporting her claim that she is entitled to wrongfully withheld performance royalties in excess of $238,000.00 and that the value of her services in the 80's included 50% of the publishing royalties. *See* Complaint at ¶18.

20.   After years of litigation and a multitude of motions filed by Sunbow and Bacal, the Supreme court held in March, 2007 that Plaintiff was entitled to whatever rights exist under her agreements with Defendants and that Plaintiff was not entitled to any equitable accounting, dismissing the case under procedural grounds prior to the close of evidence of trial. *See* Complaint at ¶19.

21.   The Supreme Court decision based its decisions upon the finding that Plaintiff had sued for on an oral agreement, despite the fact that mid-trial, Sunbow miraculously produced a written agreement.  Plaintiff, however, was precluded from amending her Complaint. *See* Complaint at ¶20.

22.   By Sunbow's actions in withholding documents and making false representations to the Court, Plaintiff was robbed of her remedies in the Supreme Court. See Complaint at ¶23.

23.   Plaintiff has not yet had her day in Court as the prior action against Sunbow was dismissed on procedural grounds. *See* Complaint at ¶24.

24. The Complaint names both the domestic and international licensees and the licensors of the respective compositions which were contained within various television broadcasts, compact discs, videocassettes, dvds and ringtones as Defendants, unlike the Supreme Court action which named only Sunbow. *See* Complaint at ¶25-73.

25. Each of these Defendants entered into license and/or distribution agreements which involved one or more of Plaintiff's composition. *See* Complaint at ¶74.

26. Pursuant to the terms of the license and/or distribution agreements that each of the Defendants executed, each Defendant was contractually obligated to account for an pay all applicable royalties and/or license fees to the authors and composers. *See* Complaint at ¶89 for descriptive listing of each Agreement between various Defendants for properties containing Plaintiff's compositions. Plaintiff was a third party beneficiary of each and every agreement involving Plaintiff's compositions. *See* Complaint at ¶77.

27. SUNBOW has reaped many millions of dollars in revenue by exploiting Plaintiff's compositions through licensing and distribution agreements. However, SUNBOW never fully, accurately and timely accounted to Plaintiff for the publishing revenue earned by it. *See* Complaint at ¶86.

28.  Sunbow has acknowledged and has sent a check to Plaintiff for publishing royalties in the amount of $4,792.58. *See* Complaint at ¶87.

29.  Pursuant to each of the license agreements detailed in the Complaint, Defendants were contractually obligated (directly or indirectly by assumption of the obligation) to account and pay all applicable royalties and/or license fees to Plaintiff as composer of the music contained in the animated television and movie productions. *See* Complaint at ¶91.

30.  The transfer of Plaintiff's copyrights to Defendant Sunbow and/or an affiliate of Sunbow was accomplished under unique and special circumstances wherein Plaintiff relinquished complete control to Sunbow in consideration of Sunbow's expressed and implied promise to do nothing to frustrate the Plaintiff's benefits under the respective agreements with Sunbow. Thus, the very nature of this relationship created a joint-venture with Plaintiff in exchange for and in consideration of Defendant's promise to exploit, license and distribute the copyrights for mutual benefit. *See* Complaint at ¶98-99.

31.  This relationship imposed an obligation upon Sunbow to impose upon it an obligation to truthfully and fairly account to Plaintiff and to ensure that third parties with whom

Sunbow licensed the compositions would do likewise. *See* Complaint at ¶100.

32. Defendants had fiduciary obligations to notify Plaintiff of their uses of her musical compositions and to remit the required payments due to Plaintiff. See Complaint at ¶107.

33. By licensing and distributing Plaintiff's musical compositions (featured in the animated tv productions, feature films, releases and cd soundtracks), Defendants' personal and business assets have been substantially increased in value and improved. *See* Complaint at ¶114.

34. Paragraph 25 thur Paragraph 73, is a summary and listing of each of the Defendants and identification of how these defendants are liable to plaintiff pursuant to which agreements.

35. Paragraph 77, pursuant to the terms of the licensing and distribution agreements which each of the defendants executed each was liable to pay all applicable royalties/ license fees to authors and composers. Plaintiff was a third-party beneficiary to each of Plaintiff's compositions.

36. Paragraph 78. Each of the defendants in this action failed to account and remit payment for the plaintiff's compositions.

11

37. Paragraph 79. Recites the first count against Sunbow on breach of contract.

38. Para. 80-81. Plaintiff composed various compositions for the Jem show. At the time suit was filed in the New York Supreme Court plaintiff did not have in her possession copies or originals of any agreements with Sunbow. The 6/1/85 Agreement was produced by Sunbow mid-trial in 2004.

39. P. 82. The Jem agreement has been accepted by Sunbow as embodying the arrangement between Plaintiff and the rest of the parties.

40. P. 83 The Court accepted the JEM agreement as controlling.

41. P. 84. Paragraph 6 of the Jem agreement granted continuing issues in plaintiff's music and publishing.

42. P. 85. The agreement allowed Sunbow to exploit plaintiff's compositions for mutual benefit of the parties consistent with the considerations and conditions of the JEM Agreement.

43. P. 86. Defendants exploited plaintiff's compositions while reaping millions of dollars in revenue.

44. P. 87. On the eve of trial of 2004, Sunbow sent Plaintiff a small payment of $4,792.58 for publishing royalties. This was the first check sent by Sunbow between 1992 and 2004

and it is significant in that it is an admission that Sunbow was obligated to pay Plaintiff publishing royalties.

45.   P. 88.   This count is against all defendants for breach of license and all distribution agreements.

## OPPOSITION TO THE MOTIONS

46.   Plaintiff's Complaint was detailed and laid out the basic claims against multiple defendants and even anticipated the very arguments that the Hasbro and Sunbow defendants advance here concerning Justice O'Rourke's Decision. The moving papers do not analyze the claims in any detail, preferring instead to characterize the claims. As set forth in the accompanying Memorandum, the well-pled allegations of that Complaint must be accepted as true for purposes of these motions and the Complaint allowed unless it appears beyond doubt that plaintiff can prove no set of facts entitling her to relief *citing* Conley v Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). Judged by that standard, the Complaint is more than sufficient.

47.   In addition to the foregoing, and as set forth in the accompanying Memorandum, under New York law the plaintiff is not barred by the doctrines of res judicata or collateral estoppel because she never had an opportunity or her day in

Court to prove her claims since her case was dismissed before the close of her evidence and the singular claim at issue at that trial was "to prove that there were **oral** as well as written contracts" [Decision March 9, 2007 annexed to Defendants' Motion as Exhibit 98].   This occurred when as Sunbow states the Court refused to allow claims on the written contracts[4].

48.   In addition to the foregoing and as pointed out in the accompanying Memorandum, Sunbow has admitted throughout the state court action and indeed here that the plaintiff continues to possess royalty rights. *See e.g.* Declaration of Ms. Phares at ¶10 "The next section (Section 6) of the Jem agreement grants to Kinder & Bryant royalty income from certain narrowly defined licenses of publishing rights in the Music…"

49.   Compare that admission with the Complaint here at paragraph 84:

84.   The Jem Agreement in paragraph 6 therein contains the following provisions among others relating to plaintiff's continuing interests in music publishing:

---

[4] Sunbow describes the proceedings in the Declaration of Ms Phares at parags 63-68 acknowledging that the state court refused the amendments based on the written Jem Agreement. In paragraph 48 of Ms Phares Declaration she advises that the Jem Agreement [the only one accepted by plaintiff] was found in August of 2004 "after a month's long search".   Those documents had been demanded over a year prior to that date but because the Note of Issue had been filed in 2003, Justice O'Rourke denied further discovery and then later the motion to amend.

"(a) With respect to Company's exercise of music publishing rights in the Music (as defined above) (but excluding use in connection with Premium Cassettes as defined in Paragraph 2(a) for which Contractor shall not receive any further compensation), uses of the Music combined with lyrics (but, if the Music with lyrics or any form thereof is the composition of Writer and other composers and/or lyricists, then the royalties hereunder shall be shared equally by all such lyricists and/or composers):

(I) sums equal to fifty (50%) percent of the net proceeds (as defined below) received by Company from third parties for licenses for the manufacture or commercial phonograph records and/or licenses of theatrical motion picture synchronization rights (as defined below);

\*\*\*\*

(vi) **with respect to other uses of the Music** hereunder, sums equal to the amount resulting form dividing fifty (50%) percent of the net proceeds received by Company from third parties therefore by the total number of copyrighted musical compositions and/or literary materials contained or included in such uses.

49. Other admissions by Sunbow of plaintiff's continued publishing rights were set forth on the record before Justice O'Rourke and in Plaintiffs own CPLR 4401 motion. Thus Sunbow has repeatedly confirmed that which it elsewhere denies: plaintiff has rights to payment of and an accounting for publishing royalty income from and through Sunbow and its licensees the other defendants.

## PLAINTIFF'S CROSS MOTION

50.   Among other issues, Sunbow's papers which are not supported by any Affidavit of person with first hand knowledge, relying on what Sunbow perceives to be the appropriate portion of the record:

    a. Contain statements without an evidentiary foundation;

    b. Contain statements which are incomplete and misleading or omit information necessary to give a complete picture of events;

    c. Make unsupported claims of the effect and intent of holdings of the New York State Supreme Court; and

    d. Argue for an unwarranted extension and misapplication of New York law.

51.   The following are examples of the foregoing with references to the Declaration of Gloria Phares, Esq. [Ph Decl. Parag. _____ ] and the Memorandum submitted by the Sunbow Defendants:

| ALLEGATION | DEFECT |
|---|---|
| Ph Dec. Parag. 5. Refers to series of alleged agreements between Hasbro and Sunbow citing "examples." | No evidentiary foundation. |

| | |
|---|---|
| Ph Decl. Parag. 6. Describing obligations under the Standard Terms of the alleged agreements. | No evidentiary foundation. |
| Ph Decl. Parag. 7. | Cited portion of testimony does not support allegation. |
| Ph Decl. Parag. 8. "That jingle work was done pursuant to letter agreements between Kinder Bryant and Griffin Bacal on behalf of Hasbro." | Cited testimony and answer of Anne Bryant was "So I don't know if they were there for all of them." |
| Ph Decl. Parag. 9. "For each T.V. show, Kinder Bryant signed an agreement with Sunbow." | No such evidence in the case and in fact, until the Jem agreement (which was accepted by Plaintiff) was produced in 2004, none of the parties to the litigation had ever seen any signed agreements between Kinder Bryant and Sunbow relating to the compositions at issue. Statement is incorrect and unsupportable by evidence of record. |
| Ph Decl. Parag. 11. "Sunbow paid Kinder & Bryant the considerations set out in each agreement for the delivery of music and for their services as performers." | No such evidence in the case and in fact, these are ultimate issues in the litigation in both the state and federal courts. |
| Ph Decl. Parag. 11. "In addition, BMI has paid Plaintiff royalties arising from the public performance of the TV shows." | While BMI has paid Plaintiff certain royalties, BMI has been sued by Plaintiff in the state court action which is now on appeal for royalties for royalties she did not receive as a result of re-registrations in her works - re-registrations acknowledged by Justice O'Rourke in prior decisions. |
| Ph Decl. Parag. 11. Allegations concerning agreements between Sony/ATV Songs Inc. and Sunbow | Lacks evidentiary support and no person with first hand knowledge has so affirmed. |

| | |
|---|---|
| regarding administration of publishing rights. | |
| Ph Decl. Parag. 11. "Sony/ATV provides royalty statements to Sunbow; Sunbow in turn, provides them to plaintiff (or her lawyer) with a check for the amount of the royalties due to Plaintiff. Exhibits 19 and 83 include the royalty statements. Plaintiff's royalty statements for the periods covering January 1, 2004 and afterwards report royalties for ringtones." (Exhibit 13 at 68: 14-15; Exhibit 83. "The Music administration agreement between Sunbow and Sony/ATV is Exhibit 20." | Counsel recitation of these alleged payments is made to suggest that there was a practice of reporting and accounting and paying royalties to the Plaintiff. However, as the cited exhibits demonstrate, *payments were only made on the eve of each trial phase in 2004 and 2006 and the payments were not accompanied by a royalty accounting statement issued by Sunbow to Plaintiff.* The contentions are misleading and incomplete. |
| Ph Decl. Parag. 12. refers to the sale of Sunbow to Sony Wonder and further transaction regarding TV Loonland AG. | No evidentiary support. |
| Ph Decl. Parag. 13. Discusses licensing back to Sony Music Entertainment Inc. and attaches license agreement, Exhibit 21 citing to it. | Lacks evidentiary foundation. |
| Ph Decl. Parag. 14. Discusses agreements between Sunbow Entertainment and Rhino Entertainment referring to Exhibit 22. | No evidentiary foundation. Although Plaintiff, on her own, by subpoena, was able to obtain a license agreement from Rhino home video, however, there has never been any testimony in the case confirming the agreement and whether it's been amended or abrogated. |
| Ph Decl. Parag. 15. Referring to transactions regarding Sony BMG and SMEI. | No evidentiary foundation. |
| Ph Decl. Parag. 16. Referring | No evidentiary foundation. Even |

| | |
|---|---|
| to Sunbow as the wholly-owned subsidiary of TV Loonland AG and other license agreements. | though Plaintiff was able to obtain copies of the foreign licenses referred to in the complaint and at Plaintiff's counsel's website. Nonetheless on this motion and at trial, such documents would require a proper evidentiary foundation for admission and consideration by the court. |
| Ph Decl. Parag. 21. Alleging that Plaintiff's amended complaint did not allege a breach of any contract, written or oral. | This statement is misleading because claims of unjust enrichment and constructive trust may arise out of the contractual relationship and thus with the liberality afforded pleadings, such claims should be considered as subsumed in the action. Furthermore, it is the facts that determine the claims not the form of the cause of action. |
| Ph Decl. Parag. 25. Recites the filing of the note of issue in June 2003 and a document request on or about that date. Almost 5 months later, in November 2003, Sunbow responded that it couldn't locate any signed work for hire agreements with Bryant. "Sunbow speculated that its original documents were lost in a flood." | In fact, *Sunbow told the court in affidavits that the documents were lost in a flood*. |
| Ph Decl. Parag. 25. "It [Sunbow] also produced another document indicating that the agreement had been signed, namely, a letter from Kinder Bryant's lawyer, William Dobishinski, proposing an amendment to the Jem agreement." | As repeatedly proven in the course of the case, William Dobishinski was an attorney selected by Sunbow, not Plaintiff. This was admitted by Carol Weitzman, the only Sunbow witness to ever testify in the case.<br><br>Q.    And when would either company have received monies, under what |

|  | circumstances?<br>A.    We also had that music administrator, so he knew about all this too.<br>Q.    Bill Dobishinksi?<br>A.    Yes.<br>Q.    Do you know where he is?<br>A.    He kind of disappeared off the face of the earth.  I don't know what happened to him.<br>Q.   Well, have you heard of a company called TAMAD?<br>A.    Oh, yeah.<br>Q.   Do you know what that stands for?<br>A.    No.<br>Q.    And he was an administrator of the publishing for Starwild and Wildstar?<br>A.    He would track the monies and hound people to get the monies in, and then he would get a fee.<br>Q.   He took a fee from the monies he tracked?<br>A.    Yes.<br>**Q.    And who hired him?**<br>**A.    Sunbow hired him.**<br>Q.    To administer Sunbow's publishing rights?<br>A.    Yes.<br><br>*See* Weitzman Testimony annexed to Defendants' Motion as Exhibit 55A at Pages 32-33.<br><br>(Ms. Weitzman was also mentioned by the court as an important witness, however, the court **never allowed her to testify**). |
| Ph Decl. Parag. 27-29. In these paragraphs, Sunbow's attorneys recite out of context and without additional pleadings a statement from an affidavit Plaintiff submitted to the court. | Plaintiff testified repeatedly that her statement about not signing away her rights was simply that she had never signed any rights relinquishing her right or royalties. A point buttressed by Sunbow's admissions and by the very language of Parag. 6 of the only written agreement accepted by both sides of the case i.e. the Jem agreement wherein |

| | Plaintiff reserves her continued interest in publishing rights. |
|---|---|
| Ph Decl. Parag. 29. Refers to Sunbow's own self serving reply. | Sunbow's reply was based on an unsigned agreement which was not one accepted by Plaintiff. |
| Ph Decl. Parag. 30-32. Sunbow discusses its motion for dismissal on the grounds of lack of subject matter jurisdiction. | Discussion of this motion is irrelevant to issues presently before the court namely whether Plaintiff has continued contractual rights pursuant to the decision of Justice O'Rourke. |
| Ph Decl. Parag. 33. Sunbow recites the decision by Justice O'Rourke from which it eventually took an appeal. | While Sunbow recites part of the decision, it doesn't recite the fiduciary relationship with Bacal portion. A finding that continued right through 2004 when the case was eventually tried so that Plaintiff was free to prove a fiduciary relationship with Bacal (See ruling of Justice O'Rourke dated May 2004 annexed to Defendants' Motion as Exhibit 44). |
| Ph Decl. Parag. 39-45. | The submission of portions of a trial are irrelevant and it is for the State Court to determine what was relevant to its ultimate decision, which concluded that Plaintiff continued to have rights. |
| Ph Decl. Parag. 46. Sunbow's counsel refers again that Dobishinski was the attorney for Plaintiff and her partner, Bryant. | Dobishinski was Sunbow's counsel as testified to by Sunbow's own witness, Carol Weitzman, as discussed above, and it is misleading to suggest otherwise. |
| Ph Decl. Parag. 49. Counsel recites the affidavit submitted by Plaintiff and Ford Kinder | Counsel omits to state that there has never been a deviation that certain other |

| | |
|---|---|
| referencing authenticated signatures. | documents submitted to the court were forged as both Plaintiff and Kinder alleged. |
| Ph Decl. Parag. 52-77. Recite in part, multiple proceedings before the resumption of the trial. | These proceedings, recited selectively by Sunbow, do not in any way assist this Court in determining whether the decision of Justice O'Rourke in March 2007, which is clear on its face, somehow disposed of all of Plaintiff's claims. They are submitted for the purpose of delay and obfuscation. |
| Ph Decl. Parag. 82. Counsel once again refers to Dobishinski being Plaintiff's lawyer. | This is simply false. Dobishinski was identified as Sunbow's own lawyer by Sunbow's own witness, Carol Weitzman, as discussed above. |
| Ph Decl. Parag. 131. Sunbow's counsel, in referring to the decision of Justice O'Rourke, says "The state court noted that "Plaintiff is entitled to whatever rights still exist under her agreements with defendants." Alluding to Plaintiff's contractual right to challenge her royalty reports under Section 6B of the Jem agreement (Exhibit 18, as Sunbow had itself explained in its motion to dismiss." | There is no such finding, or "allusion" by the Court so limiting its ruling about Plaintiff's rights. |
| Ph Decl. Parag. 132. Sunbow refers to "Sunbow [entering] the final judgment on the March 12, 2007 decision…". | At no time, in any of its orders, did the Court ever indicate that the complaint was dismissed with prejudice. Furthermore, this is an issue which will be before the Appellate Division Second Department as to the propriety of Sunbow entering an ex-parte final judgment without prior Court approval. |

| | |
|---|---|
| Ph Decl. Parag. 139. Once again, Sunbow falsely claims that Dobishinski was "Kinder and Bryant's lawyer." | This has been refuted by deposition testimony by Sunbow's own witness, Carol Weitzman, as discussed above. |
| Ph Decl. Parag. 140. Sunbow refers to a number of agreements which it indicates it produced to Plaintiffs. | None of the agreements have any evidentiary foundation as having been identified by a person with first hand knowledge. Furthermore, as the Court can see, the documents are produced according to Sunbow, one year after the note of issue was filed and discovery closed, thus precluding Plaintiff from pursuing any further discovery concerning them. |
| | |

52.   The foregoing is illustrative not exhaustive of the liberties taken with the record.  In the final analysis, the most significant is the contention that Plaintiff's rights are disposed of by Justice O'Rourke's decision.  Based upon the foregoing, and the memorandum of law, Plaintiff requests that the Court deny Defendants' motions in their entirety and grant Plaintiff's motion pursuant to Rule 11.

Patrick   J.   Monaghan,   Jr. (6297)

DATED: Montvale, New Jersey
       March 6, 2008

Sworn to before me this 6th day of March 2008

Attorney At Law New Jersey

23